CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

3/31/2025
LAURA A. AUSTIN, CLERK
BY:  s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

|  |  |
|---|---|
| WILLIAM L. RESPESS, *et al.* | |
| *Plaintiffs*, | CASE No. 6:24-cv-00028 |
| v. | |
|  | **MEMORANDUM OPINION** |
| VMI ALUMNI ASSOCIATION, | |
| *Defendant.* | JUDGE NORMAN K. MOON |

This case concerns a group of Virginia Military Institute alumni and their allegations that the Defendant VMI Alumni Association engaged in misconduct and *ultra vires* acts by, among other things, amending its articles of incorporation in 2019 without the approval of its membership, refusing to recognize a vote called by certain alumni to remove members of its board of directors, and suspending or expelling certain individuals. The Plaintiffs contend in their Amended Complaint that VMIAA is liable under 42 U.S.C. § 1983 for depriving them of their First and Fourteenth Amendment rights. However, they have failed to sufficiently allege a threshold matter - that VMIAA, a private nonprofit entity, *acted under color of state law*. Indeed, the Amended Complaint, the briefing on VMIAA's motion to dismiss, and the parties' representations at oral argument underscore that this case is largely a dispute about the control and management of a private nonstock corporation formed under the Virginia Nonstock Corporation Act. The Plaintiffs repeatedly assert that VMIAA was "pervasively entwined" in a "symbiotic relationship" with VMI, a public military college. Nevertheless, the Amended Complaint fails to allege facts that, if taken as true, would plausibly establish that VMIAA engaged in state action for the purposes of Section 1983. For the reasons provided below, the Court grants VMIAA's motion to dismiss Counts 1 and 2 of the Amended Complaint. The Court

declines to exercise its supplemental jurisdiction under 28 U.S.C. § 1367(a) to consider the

remaining state law claims. *See* 28 U.S.C. § 1367(c)(3).


# I. BACKGROUND

The facts alleged in the Plaintiffs' Amended Complaint are accepted as true for the

purposes of considering a motion to dismiss. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir.

2016).

The VMI Alumni Association ("VMIAA") is a Virginia nonstock corporation organized

under the Virginia Nonstock Corporation Act. Dkt. 4 ("AC") at ¶ 6. Its principal office is in

Lexington, Virginia. *Id*.

The Plaintiffs are VMI alumni who graduated between the years 1960 and 1990. *Id*. at ¶¶

7-34.[1] They hold or have held "active member" status in the VMIAA. *Id*.

VMIAA has existed in various forms and by different names going back to 1842. *Id*. at ¶

36. It was first incorporated in 1919 under the Virginia Nonstock Corporation Act ("VNCA"). *Id*.

at ¶ 37**.** The association's purpose at the time of its initial incorporation, and up until today, is "to

organize alumni and old cadets of the Virginia Military Institute in one general body, so as the

better to keep alive the memories of Institute life, and by their united efforts to more efficiently

aid in the promotion of the welfare of the Institute, and the successful prosecution of its

educational purposes in the future." *Id*.

The VMI Foundation, Inc. ("Foundation") is an affiliated entity of VMIAA that was first

incorporated in 1937 under the VNCA. *Id*. at ¶ 38. The Foundation accepts gifts, grants,

bequests, and other donations to use for the benefit of VMI and the VMIAA. *Id*.

---

[1] One of the Plaintiffs, Peter K. McCrary, graduated in 1956 but died in February 2024 and is represented in this suit
by the executor of his estate, John McCrary. AC at ¶ 23.

Over time, the Plaintiffs allege that VMIAA and VMI have developed a close relationship – in their view, an increasingly "symbiotic relationship." *Id*. at ¶ 38. An early example of this connection that the Plaintiffs point to is VMIAA and the Foundation's intervention as defendants in *United States v. Virginia* to represent the interests of VMI in litigation over the admission of women to VMI in the 1990s. *Id*. at ¶ 39; *see also United States v. Virginia*, 518 U.S. 515, 523 n.3 (1996). VMIAA and the Foundation also provide significant financial support to VMI. AC at ¶ 40. The Plaintiffs estimate this is about $27 million annually, about 38-50% of the school's operating budget. *Id*.

## A. 2019 Restructuring

The Plaintiffs' allegations of impropriety and illegal acts by VMIAA go back to an organizational restructuring in 2019. During that year, four VMI alumni organizations referred to as "the Alumni Agencies" – the VMIAA, the Foundation, the VMI Development Board, Inc., and the VMI Keydet Club, Inc. – restated their articles of incorporation with the state of Virginia. *Id*. at ¶ 41. Following the restatement, VMIAA, the Foundation, and the Keydet Club were organized under a renamed VMI Development Board – now known as the "VMI Alumni Agencies Board." *Id*. This entity's purpose includes "governance, oversight and coordination of the activities and operations of the VMI Alumni Agencies in carrying out their respective missions in support of VMI." *Id*.  The Plaintiffs allege the Alumni Agencies hold an endowment worth over $700 million and that the effect of the 2019 restructuring was to "give VMI and its administrative virtually total control over the VMIAA and the entwined alumni agencies," and their funds. *Id*. The Plaintiff also contend that the creation of a Chief Executive Officer position to lead the VMI Alumni Agencies led to further entwinement because VMI's administration was

"directly involved in choosing the individual who became the CEO" and the CEO "provided VMI and its administration with more control over the VMI Alumni Agencies, including the VMIAA." *Id*. at ¶¶ 41-42.

The Plaintiffs allege other facts to underscore what they view as entwinement of the VMIAA and VMI:

- The VMI Superintendent issued a memorandum in 2023 stating that the VMI Alumni Agencies were among the only recognized external funding sources for VMI and that "it is the policy of the Institute to recognize only those donations made to the VMI Alumni Agencies for purposes of official VMI functions, ceremonies, and publications." *Id*. at ¶ 46.

- VMI and its administration participated in the evaluation and recommendation of candidates for the VMIAA board of directors, *id*. at ¶ 49, and VMIAA "directly participated in the evaluation and recommendation of candidates for administrative positions at VMI, including the Superintendent and Commandant." *Id*. at ¶ 47.

- "VMI deliberately conspired with the VMIAA to force VMI's 125+ year-old independent student newspaper, *The Cadet* … to become part of the VMIAA Communications' office and/or otherwise under the direct control and/or influence of VMI while simultaneously violating the First Amendment rights of the VMIAA members, including some of your plaintiffs, who provided support to VMI cadets and their publication to remain independent and exercise their rights under the First Amendment … After initially fully endorsing the initiative to restart *The Cadet* after the previously administration closed it in 2019, the VMIAA reversed course and disavowed the newspaper after it refused to become part of the VMIAA under the direct control of VMI." *Id*. at ¶ 48.

4

- Three members of VMI leadership (the Superintendent and two members of the VMI Board of Visitors) served on the VMI Alumni Agencies, Inc. board of directors. *Id*. at ¶¶ 50-52.

- The VMIAA and the Foundation have served as obligors on municipal bonds for VMI. *Id*. at ¶ 53.

The 2019 amendments to the VMIAA articles of incorporation also removed the right of members to vote by proxy, *id*. at ¶ 57, and the VMIAA's board of directors submitted the 2019 amendment to the Virginia State Corporation Commission without notice to members, nor members' approval. *Id*. at ¶¶ 58-59.


**B. 2020 Investigation**

In 2020, VMI faced public allegations of structural racism and a state investigation looked into the school's culture and policies. *Id*. at ¶ 60. The report, issued in June 2021 by the law firm Barnes & Thornburg LLP, found that the Alumni Agencies hampered investigators' efforts to interview alumni of diverse opinions and experiences because it refused to provide an alumni list due to privacy concerns. *Id*. at ¶ 63. The report also emphasized that the role that Alumni Agencies play in fundraising for VMI should lead to more transparency in their fundraising sources and funding decisions. *Id*.

The Plaintiffs state in their complaint that they were troubled by the report's conclusions, as well as VMIAA and VMI's handling of the claims of structural racism. *Id*. at ¶ 64 "Many VMI alumni, including your plaintiffs, began investigating ways to address their grievances with VMI and the VMIAA, both of which were actively silencing the opinions of the VMI alumni, including your plaintiffs." *Id*. Around this time, some of the Plaintiffs learned about the

circumstances surrounding the 2019 restructuring of the VMIAA and the alleged lack of member involvement in that decision. *Id*. The Plaintiffs wanted to contact other members and requested VMIAA's membership records.  *Id*. VMIAA first refused the requests and then "was forced to provide the names and mailing addresses of the members," although VMIAA has not provided the email addresses of its 20,000+ members. *Id*. at ¶ 70.[2]

## C. Controversy at VMIAA Meetings in 2022

Conflict between Plaintiffs and the VMIAA continued to grow over allegations of improper governance and management of the association, leading to a series of confrontations at a pair of meetings in April and June of 2022.

On April 9, 2022, one hundred "active members" of VMIAA - including many of the Plaintiffs – convened in Lexington for the organization's annual meeting. *Id*. at ¶¶ 72-73. The Plaintiffs attended the meeting "for the specific purpose of redressing their grievances with VMI and the VMIAA and to remove the directors of the VMIAA" who they believed "were controlled entirely by VMI." *Id*. at ¶ 73. Attendees, including Plaintiffs, voted in favor of a motion to remove VMIAA's directors. *Id*. at ¶ 75. "Not one member voted against the motion." *Id*. Proponents of removing the directors asserted they had the right to do so under Article 5.2 of the VMIAA Articles of Incorporation. *Id*. at ¶ 74. However, VMIAA leadership rejected the motion and vote as out of order and said that a special meeting would need to occur for the purpose of removing directors. *Id*. at ¶¶ 76-77, 79. VMIAA's counsel also told attendees that VMIAA

---

[2] The Amended Complaint is unclear about who "forced" this disclosure. In *Respess v. VMI Alumni Association*, 902 S.E.2d 105, 106 (Va. App. 2024), the Court of Appeals of Virginia affirmed a trial court's decision that the Virginia Nonstock Corporation Act does *not* require a nonstock corporation, like VMIAA, to disclose its members' email addresses. The Court of Appeals held that "a member's statutory right to inspect the record of members does not extend to the members' email addresses." *Id*.

members had voted to approve the 2019 article amendments. *Id*. at ¶ 78.  VMIAA's counsel and

president made comments at this meeting that gave the attendees the impression that a special

meeting would later be called to give members, including the Plaintiffs, a chance to remove

directors. *Id*. at ¶ 79. Over the objections of attendees, the VMIAA President Sam Stocks

adjourned the annual meeting. *Id*.

Tensions continued to simmer at a special meeting held a couple months later, on June 11,

2022, in Lexington. *Id*. at ¶ 80. At that meeting, Stocks "did not allow any motions of any kind

and only permitted the members to vote to elect directors, as hand-picked by the 'Nominating

Committee' of the VMIAA." *Id*. In response to an attendee's question about parliamentary

procedure for resolving issues that arose at the meeting, Stocks said the rules to be followed are

"my rules." *Id*. One of the Plaintiffs also asked for a list of members entitled to vote at the

meeting and Stocks referred the Plaintiff to an attorney representing VMIAA's Board of

Directors, who, in turn, said he did not have a list. Thus, the Plaintiffs allege that "no list of

members was available at the meeting to permit determination if persons attending the meeting

and voting were entitled to vote." *Id*.

**D. Suspensions of Members**

The following year, on September 6, 2023, VMIAA's board of directors "acting jointly

and in concert with VMI and its administration" sent letters to seven of the Plaintiffs informing

them that they were suspended from the organization. *Id*. ¶ 81. VMIAA suspended six of them

for 10 years and one of them, Robert C. Morris, Jr., permanently. *Id*. The expulsion of Morris

came after the Rockbridge County Circuit Court sanctioned VMI "for making false and

misleading representations" in a case Morris's company had filed against the school, alleging

7

that it had violated state procurement rules in awarding a state contract. *Id*. at ¶ 82. The circuit court ordered VMI to pay $15,000 to Morris's company. *Id*.

In a suspension reaffirmation letter dated October 24, 2023, VMIAA alleged that the suspended members had used their access to a database called "VMI Ranks" – which has records of VMIAA members – in an improper manner. *Id*. at ¶ 84. The Plaintiffs contend that they were compiling email addresses to communicate with other VMIAA members, and that all the suspended members had participated in the April and/or June 2022 meetings. *Id*. at ¶¶ 83-84. Plaintiffs allege that VMIAA "has never suspended any members who accessed the record of members of the VMIAA as contained in VMI Ranks" and that VMIAA "routinely provided the email addresses (and other information) of its members to those who could provide personal, financial, or political gain to VMI or members of its administration, or to the VMIAA and members of its board of directors." *Id*. at ¶ 93.

After these suspensions were issued, VMIAA's board of directors enacted a policy called "VMIAA – Procedure for Disciplinary Appeal Hearing." The Plaintiffs allege it "lacks every element of the due process guaranteed by the Fourteenth Amendment to the United States Constitution." *Id*. at ¶ 91.

In January 2024, VMIAA's board of directors also issued a "Statement of the Rights, Privileges and Disciplinary Policies and Loss of Privileges of the Members of the VMI Alumni Association." *Id*. ¶ at 94. The statement outlined the consequences of expulsion or suspension of VMIAA membership, such as being denied access to the group's facilities and events sponsored by the "Alumni Agencies" (i.e., VMIAA, the Foundation, and the Keydet Club). *Id*. at ¶ 95.


### E. VMIAA Makes "False and Misleading Statements"

The Plaintiffs contend that starting in January 2024, VMIAA "acting jointly and in concert with VMI" made "false and misleading statements to the media, members of the VMIAA, and the public at large" regarding the suspended members. *Id*. at ¶ 96. These statements were made "to willfully and maliciously injure the Suspended Members in their reputations, trade, business, and/or profession." *Id*. ¶ at 96. The Plaintiffs also assert that these statements targeted other Plaintiffs in addition to those who were formally suspended. *Id*. ¶ 98.

One example of such a statement appeared in an article entitled, "VMI boots alums for stealing alums' info." *Id*. VMIAA distributed the article to members, claiming that the suspended members had [p]articipated in the scraping or harvesting and subsequent use of over 6,000 VMI alumni's private contact profiles in violation of the VMIAA bylaws and policies." *Id*. Another statement alleged that a suspended member had "sued the VMIAA to turn over the private email of VMI alumni." *Id*. The Plaintiffs contend the statements were false and that VMIAA knew so at the time of publication. *Id*. They contend there was no effort to scrape, harvest, or use over 6,000 alumni private contact profiles in a manner that violated VMIAA bylaws and policies. *Id*. They also contend the information in VMI Ranks (the database) was already publicly available in the "Register of Former Cadets of VMI," a book which can be found online. *Id*. Additionally, the suspended members requested copies of any bylaw or policy that they violated but VMIAA did not provide it. *Id*.

**F. 2024 Annual Meeting**

At the 2024 VMIAA annual meeting,[3] members were permitted to vote by electronic means for candidates for the board of directors.  *Id*. at ¶ 106. The Plaintiffs contend this was not

---

[3] The complaint does not provide a date for this meeting.

allowed under the Articles of Incorporation. *Id*. Additionally, the electronic system only allowed

members to vote for directors who were vetted by VMIAA's "Nominating Committee." *Id*.

Members were unable to vote for other candidates, which the Plaintiffs contend was improper.

*Id*.


## II. PLAINTIFFS' CLAIMS AGAINST VMIAA

The Plaintiffs assert four claims against VMIAA:

### A. Count One: Deprivation of Civil Rights Under 42 U.S.C. § 1983

The Plaintiffs contend that VMIAA and VMI, a state agency, are "pervasively entwined"

and have a "symbiotic relationship." AC at ¶ 108. Accordingly, the Plaintiffs argue that VMIAA

should be treated as if it were an entity acting under "color of law." *Id*. They allege that the

VMIAA's actions alleged above violated their constitutional rights to "free speech, free

assembly, a redress of their grievances, and their right to vote," as protected by the First

Amendment. *Id*. ¶ at 112. They also allege VMIAA violated their due process rights under the

Fourteenth Amendment. *Id*. at ¶¶ 111-12. The Plaintiffs assert that VMIAA violated 42 US.C.

§1983, which prohibits the deprivation of a citizen's civil rights by a person acting under "color

of law." *Id*. at ¶¶ 107-113.


### B. Count Two: Deprivation of Civil Rights Under 42 U.S.C. § 1983 (Suspended members only)

Plaintiffs who were suspended from VMIAA allege that the organization's actions toward

them violated their rights under the First Amendment (what they describe as rights to "free

speech, free assembly, a redress of their grievances, and their right to vote") and their Fourteenth

Amendment due process rights. *Id*. at ¶¶ 117-18**.**

**C. Count Three: Civil Conspiracy Under Va. Code §§ 18.2-499 and 18.2-500**

Plaintiffs contend that the VMIAA's "false and misleading statements" about the

Plaintiffs in the media and other settings violated Virginia's civil conspiracy statutes because

such statements were made for the purpose of willfully and maliciously injuring their reputation,

trade, business, or profession. *Id*. at ¶¶ 121-24.

**D. Count Four: Ultra Vires Acts Under Va. Code § 13.1-828**

The Plaintiffs allege various state law claims arising from how the VMIAA is governed

and conducted several meetings. *See id*. at ¶¶ 125-34.

They allege, for example, that VMIAA has amended its articles of incorporation without

member notice or involvement "multiple times since 1980, the latest amendment resulting in the

restructuring of the VMI Alumni Agencies in 2019 and the additional loss of control of the

VMIAA by its members." *Id*. at ¶ 128. In addition to "constitutional infringements," the

Plaintiffs contend these actions "violate Va. Code 13.1-828 as they were *ultra vires*." *Id*.

They also contend that the way VMIAA conducted its board of directors elections in

2022, 2023, and 2024 were "constitutional infringements" that violated requirements of the

organization's Articles of Incorporation and the Virginia Nonstock Corporation Act. *Id*. at ¶ 129.

Similarly, they contend that VMIAA's "refusal to recognize the lawful vote" of members at the

April 9, 2022 and June 11, 2022 meetings to remove and replace directors violated members

constitutional rights, as well as state law. *Id*. at ¶¶ 130-31.

### E. Plaintiffs' requested relief

The Plaintiffs seeks various forms of declaratory and injunctive relief. *Id*. at 47-50.

Requested declaratory relief includes declarations by the Court that (1) the VMIAA and VMI were "pervasively entwined and engaged in a symbiotic relationship at all times relevant to the allegations set forth in this Complaint," (2) VMIAA violated Plaintiffs' constitutional rights; (3) VMIAA violated suspended member plaintiffs' constitutional rights; (4) that active members of the VMIAA present at any meeting have a right to elect and remove directors; (5) amendments to the articles of incorporation were *ultra vires* under Virginia law; and (6) bylaw amendments regarding suspension, expulsion, disciplinary appeals, and the rights of members were *ultra vires*. *Id.* at 47-49.

Plaintiffs also seek a declaration that VMI and VMIAA concerted together to willfully and maliciously injure the suspended members in their reputations, trades, businesses, or professions. *Id.* at 49.

The Plaintiffs also want the Court to take steps that reverse what they see as unlawful corporate acts. This includes a request that the Court declare the Articles of Incorporation "null and void dating back to the last version for which the [VMIAA] can prove to this Court that it complied with the law by providing notice and by receiving approval by the members," and order actions taken since the "illegal amendment" of the Articles be "set aside." *Id*. This would include setting aside elections, changes to the Articles and Bylaws, resolutions, member suspensions, and financial agreements. *Id*.

Finally, the Plaintiffs ask the Court to remove VMIAA board members who were "voted out" on April 9, 2022 and those who were "unlawfully" elected in 2023 and 2024. *Id*. at 49-50. This would be followed by a Court-supervised election. *Id*.

**F. Motion to Dismiss**

VMIAA moves to dismiss the Plaintiff's Amended Complaint under Fed. R. Civ. P.

12(b)(6). Dkts. 15-16. The organization contends that Counts 1 and 2 fail to state a claim under

42 U.S.C. § 1983. *Id*. Moreover, VMIAA argues that Count 3 fails to state a claim under the

Virginia business conspiracy statute, Va. Code §§ 18.2-449 and 500, and that Count 4 fails to

state an *ultra vires* claim under Va. Code § 13.2-828. *Id*.


### III. LEGAL STANDARDS

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a

complaint to determine whether a plaintiff has properly stated a claim. It does not, however,

"resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."

*King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*,

178 F.3d 231, 243 (4th Cir. 1999)). To state a claim, "[f]actual allegations must be enough to

raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007), accepting all well pleaded factual allegations in the complaint as true and taking all

reasonable inference in the plaintiff's favor. *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346

(4th Cir. 2005). A court need not accept as true "legal conclusions, elements of a cause of action,

… bare assertions devoid of further factual enhancement, … unwarranted inferences,

unreasonable conclusions, or arguments." *Richardson v. Shapiro*, 751 F. App'x 346, 348 (4th Cir.

2018) (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir.

2009) (internal quotation marks omitted)).


### IV. DISCUSSION

**A. The Plaintiffs do not plausibly allege federal claims**

The Court begins (and ends) its analysis with the federal claims. In Counts 1 and 2, the

Plaintiffs contend that VMIAA violated 42 U.S.C. § 1983 by depriving Plaintiffs of their First

and Fourteenth Amendment rights.

There are three elements of a § 1983 claim: "(1) the deprivation of a right secured by the

Constitution or a federal statute; (2) by a person; (3) acting under color of state law.'" *Herman v.*

*Lackey*, 309 Fed. Appx. 778, 782 (4th Cir. 2009) (quoting *Jenkins v. Medford,* 119 F.3d 1156,

1159–160 (4th Cir.1997)). The Plaintiffs' failure to allege facts that, taken as true, would

plausibly establish that a private, non-profit alumni group acted under the color of law is

dispositive of these two counts.

"The statutory color-of-law prerequisite is synonymous with the more familiar state-

action requirement—and the analysis for each is identical." *Philips v. Pitt County Memorial*

*Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). To establish this third element of a §1983 claim, the

Plaintiffs must allege facts that would tend to show that the conduct at issue is "fairly attributable

to the State." *Id*. at 181 (quoting *Holly v. Scott,* 434 F.3d 287, 292 (4th Cir. 2006)). Otherwise,

merely private conduct is excluded from § 1983 liability. *See Dowe v. Total Action Against*

*Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998) ("This fundamental limitation on

the scope of constitutional guarantees 'preserves an area of individual freedom by limiting the

reach of federal law." (quoting *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 619 (1991))).

The color-of-law jurisprudence features several tests that courts use to assess when a

private entity takes on a public character, transforming its ostensibly private conduct into state

action. *See, e.g., Robinson v. Davis*, No. 4:15-cv-00040, 2015 WL 9581867, at *5 (W.D. Va. Dec.

30, 2015) (describing tests used to determine when an action is fairly attributable to the state for

§ 1983 purposes). Here, the Plaintiffs' Amended Complaint heavily leans on two such tests:

"pervasive entwinement" and "symbiotic relationship." *See, e.g.*, AC at ¶¶ 108, 112, 115, 119.

The "pervasive entwinement" test considers whether a private entity has a "largely

overlapping identity" with public institutions and officials. *Brentwood Academy v. Tennessee*

*Secondary School Athletic Ass'n*, 531 U.S. 288, 303 (2001). The Supreme Court articulated this

concept in *Brentwood*, where it held that a non-profit, voluntary high school athletic association

engaged in state action for Section 1983 purposes. This was because "[t]he nominally private

character of the Association is overborne by the pervasive entwinement of public institutions and

public officials in its composition and workings." *Id*. at 298.  Two key aspects of the association

supported the Court's conclusion. First, the overwhelming majority – 84% – of its members were

public schools. *Id*. at 298-300. Second, each school was represented by a principal or faculty

member, who could then vote "in selecting members of the governing legislative council and

board of control [of the Association] from eligible principals, assistant principals, and

superintendents." *Id*. at 298.  Given these facts, the Court explained that "[t]here would be no

recognizable Association, legal or tangible, without the public school officials, who do not

merely control but overwhelmingly perform all but the purely ministerial acts by which the

Association exists and functions in practical terms." *Id*. at 299-300.

The "symbiotic relationship" test has its origins in a different Supreme Court decision,

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). There, the Court found state

action for Fourteenth Amendment purposes when a restaurant leased space in a parking building

owned by a municipal parking authority and the restaurant discriminated against black

individuals. *Id*. at 716-17. The Court explained that "profits earned by discrimination not only

contribute to, but also are indispensable elements in, the financial success of a governmental

agency." *Id*. at 724. The parking authority (a state agency) put itself "into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Id*. at 725. But the Fourth Circuit has cautioned against overreading *Burton* because its holding "does not stand for the proposition that all public and private joint activity subjects the private actors to the requirements of the Fourteenth Amendment." *DeBauche v. Trani*, 191 F.3d 499, 507 (4th Cir.1999). For example, the Supreme Court has noted that its precedents "have established that 'privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton*.'" *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 57 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982)). Similarly, the Fourth Circuit has cited to language from *Blum* to explain that "private activity will generally not be deemed 'state action' unless the state has so dominated such activity as to convert it into state action because '[m]ere approval of or acquiescence in the initiatives of a private party' is insufficient." *DeBauche*, 191 F.3d at 507 (quoting *Blum*, 457 U.S. at 1004)).

Ultimately, no matter which "category" or "test" a party relies on, the "totality of the circumstances" is "determinative." *Philips*, 572 F.3d at 184. "[A]ll roads lead back to a finding of state action 'if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior 'may fairly be treated as that of the State itself.'" *Id*. (quoting *Brentwood*, 531 U.S. at 295) (internal quotations omitted).

Here, the Plaintiffs fail to plausibly allege this close nexus for several reasons.

*1. VMI plays no role in VMIAA's corporate governance structure*

16

First, and perhaps most significantly, the corporate structure of VMIAA shows that VMI

exerts no formal control over the leadership of this nonstock corporation. The Amended and

Restated Articles of Incorporation of the VMI Alumni Association, submitted to the State

Corporation Commission in 2019,[4] provide that the corporation's affairs "shall be managed by its

Board of Directors." Dkt. 16-1 ("VMIAA AOI") at Art. 6.1. The Board is composed of (1)

directors elected by the membership and (2) up to eight *ex officio* directors, including five voting

*ex officio* directors (presidents of the VMI Foundation and the VMI Keydet Club, and the

VMIAA President and two Vice Presidents) and three nonvoting *ex officio* directors (immediate

past president of VMIAA, VMIAA's CEO, and VMIAA's Historian). *Id*. at Art. 6.2-6.3. The

Articles do not expressly provide for representation of VMI on the Board. Pursuant to Art. 6.5,

"all other matters concerning the Board" are set out in the VMIAA Bylaws. The Bylaws, in turn,

provide for seven "directors at large" and 16 "regional directors," all of whom are elected by the

VMIAA members. Dkt. 16-3 ("VMIAA Bylaws") at Ex. A, Art. 1(a)-(b). There are no provisions

in the Articles or Bylaws for VMI to control the appointment and removal of Board members.

There is also nothing in the record to show (nor have the Plaintiffs expressly alleged) that VMI

---

[4] Although the Plaintiffs did not attach the VMIAA Articles of Incorporation to their Amended Complaint, the Court may properly take notice of these Articles as well as the Articles of Incorporation for the other relevant alumni entities (VMI Foundation, Inc., VMI Keydet Club, Inc., and VMI Alumni Agencies Board, Inc.) and the Bylaws for VMIAA and the VMI Alumni Agencies Board, Inc. These were all filed with the Court as attachments to VMIAA's memorandum in support of its motion to dismiss. Dkt. 16. When ruling on a motion to dismiss, "it is well established that a document attached to a motion to dismiss may be considered when evaluating a motion to dismiss if the document was 'integral to the complaint and authentic.'" *Goines v. Valley Community Services Bd.*, 822 F.3d 159, 164 (4th Cir. 2016) (quoting *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). A document is "integral to the complaint" when the complaint "relies heavily upon its terms and effect." *Id.* at 166 (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). Here, these various documents are integral to the Amended Complaint because it repeatedly refers to the corporate form, governing documents, and 2019 "restructuring" of these entities, *see, e.g.*, AC at ¶¶ 2, 7-34, 38, 41, 56-59, 87-90, 106. The Plaintiffs have also not called the authenticity of these documents into question. Additionally, the Articles of Incorporation for the four alumni entities are available on the State Corporation Commission website. *See* Commonwealth of Virginia State Corporation Commission, Business Entity Search, https://cis.scc.virginia.gov/EntitySearch/BusinessFilings (last visited March 31, 2025) *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").

personnel or leadership occupy a controlling share of the seats on the VMIAA Board. Thus,

VMIAA members – alumni – control the VMIAA, *not* VMI. This is distinct from the facts in

*Brentwood*, where public schools made up 84% of a high school athletic association's

membership. 531 U.S. 298-300. Here, no facts point to a comparable "overlapping identity"

between VMIAA and VMI other than the fact that the members of VMIAA are alumni of the

school. *Id*. at 303.

Even if it was true that VMI administrators "participated in the evaluation and

recommendation of candidates" for the VMIAA's board of directors and other alumni agencies,

AC at ¶ 49, such influence, by itself, does not raise an inference of state control. In cases where

public officials played a more formal role in officially appointing members of a private entity's

governing board, the Fourth Circuit has not found such circumstances to be determinative of

state action or control. *See, e.g*, *Moore v. Williamsburg Regional Hosp*., 560 F.3d 166, 179 (4th

Cir. 2009) (noting that board of directors of a private non-profit hospital was "nominated by the

county delegates to the [South Carolina] state legislature and approved by the Governor, and two

government officials (the county supervisor and a county representative) serve as ex-officio

members of the Board" but that such facts did not make the state responsible for the hospital's

privileging decisions); *Philips*, 573 F.3d at 183-84 (affirming district court's determination that

state action was absent even though a county government and another state actor had "exclusive

authority" to appoint a private nonprofit hospital's board members). Here, the Plaintiffs have not

alleged facts that, taken as true, would show that VMI plays a formal or controlling role in the

appointment of VMIAA Board members. To the extent that the Plaintiffs allege that VMI

exercised informal influence over VMIAA's Board, this would not rise to the level of state action

for § 1983 purposes. *See Davenport v. Casteen*, 878 F.Supp. 871, 878 (W.D. Va. 1995)

("[Plaintiff] has only demonstrated that [the University of Virginia President] has sway with the Boards [of two private nonstock corporations]. But more than the practical ability to influence action is required. The state actor must possess and exercise coercive power."); *DeBauche*, 191 F.3d at 507 (explaining that "the Supreme Court has held that private activity will generally not be deemed 'state action' unless the state has so dominated such activity as to convert it into state action").

It is also important to note that the Plaintiffs allege various examples of what they view as entwinement or symbiosis between VMI and entities *that are not the defendant* in this case. For example, they allege that the VMI Superintendent was on the board of directors of the VMI Alumni Agencies Board, Inc., the VMI Keydet Club, Inc., and the VMI Foundation, Inc. AC at ¶ 50. Absent from this list is the board of directors of VMIAA, the defendant entity.[5] Similarly, the Plaintiffs allege overlapping membership between the VMI Board of Visitors and leadership of other alumni entities, namely the VMI Alumni Agencies, Inc. and the VMI Foundation, Inc. AC at ¶¶ 51-52. They do not, however, allege that VMI Board of Visitors members are on the VMIAA board. [6]

Even assuming, *arguendo*, that the other alumni entities were extensions of or otherwise synonymous with VMIAA, these entities' governing documents show that VMI plays a very limited role in their leadership structures.

---

[5] The Plaintiffs also allege that the VMI Superintendent is a "voting member of the VMIAA," AC ¶ 50, but as VMIAA points out, this would be because he is an alumnus. Dkt. 16 at 39 n.30.
[6] Some of the examples of purported state action allege more about VMI than VMIAA. For example, the Plaintiffs describe an alleged controversy over the operation of VMI's student newspaper. AC at ¶ 48. They describe the paper as "independent," which the Court assumes to mean not formally affiliated with VMI. *Id*. The Plaintiffs assert that VMI attempted to "control funds and sources of funds" donated to the newspaper, but this seems like more of a dispute between VMI and the newspaper. *Id*. The Plaintiffs also allege that the newspaper "refused to become part of the VMIAA." *Id*. Even so, it is hard to see how this alleged interaction between VMIAA and the newspaper involved state power. If anything, this would have involved two private entities, VMIAA and the newspaper.

The VMI Foundation is a nonprofit Virginia nonstock corporation organized to solicit and accept donations for VMI and the VMIAA. Dkt. 16-4 ("VMIF Articles") at Art. I-II. According to its Amended and Restated Articles of Incorporation, its "members" are individuals who serve on the VMIAA Board of Directors. *Id*. at Art. 5.1 The members can, in turn, vote to amend the articles of incorporation, modify or repeal bylaws adopted by its board, and dissolve the Foundation, among other actions. *Id*. at Art. 5.2 The Foundation is managed by a Board of Trustees, composed of "elected trustees" selected by the members and seven "ex officio trustees," made up of three voting trustees (the VMIAA President, the VMI Keydet Club President, and the Chairman of VMI Investment Holdings, LLC) and four nonvoting trustees (the President of the VMI Board of Visitors, the VMI Superintendent, the Foundation's CEO, and a VMI faculty member appointed by the Superintendent). *Id*. at Art. VI. Thus, to the extent that the Foundation's articles provide VMI express representation, it only has three nonvoting *ex officio* seats on the Board (through the VMI Board of Visitors President, the VMI Superintendent, and a faculty member). VMI does not formally have an *ex officio* position with voting power, and the members – those on the VMIAA Board - select any of the "elected" trustees.

The Keydet Club is also a nonprofit Virginia nonstock corporation organized to "support and strengthen the intercollegiate athletic program" at VMI. Dkt. 16-5 ("KC Articles") at Art. I-II. Like the Foundation, the Keydet Club's Amended and Restated Articles of Incorporation provide that the club's members are solely composed of those serving on the VMIAA Board of Directors. *Id*. at Art. 5.1. These members' authority includes amending the bylaws, dissolving the Keydet Club, and modifying the bylaws. *Id*. at Art. 5.2(b). The club is managed by a "Board of Governors," composed of elected governors chosen by the members and six *ex officio* governors, including four with voting power (VMI Foundation President, VMIAA President, the Keydet

Club's immediate past president, and the Keydet Club Historian) and two without voting power (VMI Superintendent and Keydet Club CEO). *Id*. at Art. VI. Here, VMI only expressly controls one of the "governor" positions – a nonvoting seat held by the VMI Superintendent. This suggests VMI has little formal authority over the Keydet Club.

The final entity referenced in the Amended Complaint is the VMI Alumni Agencies Board, Inc., known before the filing of its 2019 Amended and Restated Articles of Incorporation as the "VMI Development Board, Inc." Dkt. 16-6 ("VMIAAB Articles"). The Alumni Agencies Board is a nonprofit Virginia nonstock corporation. *Id*. at Art. I-II. The Alumni Agencies Board is a "supporting organization" for the three other alumni entities – the VMI Foundation, the VMIAA, and the VMI Keydet Club (collectively called the "Alumni Agencies"). *Id*. at Art. II. Its stated purposes include "governance, oversight, and coordination" of the three alumni organizations, "strategic planning," and "financing transactions" to "further the Corporation's purposes as well as the purposes of the VMI Alumni Agencies and VMI." *Id*. The Alumni Agencies Board's members are individuals who serve on the VMIAA Board of Directors. *Id*. at Art. V. These members can amend the articles of incorporation, dispose of the corporation's assets, and amend bylaws, among other things. *Id*. However, the members do not select the governing board. Instead, the Board of Directors of the Alumni Agencies Board is made up of two nonvoting directors (the VMI Superintendent and the Alumni Agencies Board CEO) and seven voting directors: two appointed by the VMI Foundation; two appointed by the VMIAA board; two appointed by the Keydet Club board; and one member of the VMI Board of Visitors. *Id*. at Art. VI. Thus, of these nine members, the Articles formally assign VMI only two positions – one nonvoting (the VMI Superintendent) and one voting (the member of the VMI Board of

21

Visitors). This distribution of board positions underscores that while VMI has a role in the governance of the Alumni Agencies Board, it is a limited one.

Although the Plaintiffs characterize the "2019 restructuring" as a "takeover" of VMIAA by VMI, AC at ¶ 41, the Amended and Restated Articles of Incorporation analyzed above suggest that the VMIAA has considerable influence because the VMIAA Board of Directors – most of whom are elected by VMIAA members – are the "members" of the three other entities: the Foundation, the Keydet Club, and the Alumni Agencies Board. Though the Court must treat the Plaintiffs' factual assertions as true and view them in the light most favorable for the purposes of evaluating a motion to dismiss, it need not "accept allegations that 'represent unwarranted inferences, unreasonable conclusions, or arguments,' or that 'contradict matters properly subject to judicial notice or by exhibit.'" *Massey v. Ojaniit,* 759 F.3d 343, 353 (4th Cir. 2014) (quoting *Blankenship v. Manchin,* 471 F.3d 523, 529 (4th Cir.2006)). The Articles of Incorporation strongly undercut the allegation that VMI and its administration had "direct control" over VMIAA after the 2019 restructuring. AC at ¶ 41.

Nevertheless, the Plaintiffs allege that a description of the Chief Executive Officer position of the VMI Alumni Agencies Board, Inc. in the corporation's bylaws shows that VMI - in combination with the VMI Alumni Agencies Board., Inc. and its CEO - assumed "direct control over the governance of the VMIAA." AC at ¶ 41. (Note that the CEO of the Alumni Agencies Board, Inc. is also the CEO of the VMIAA, the Foundation, and the Keydet Club. *Id*.)

The relevant language of this provision, Article 4.5 of the bylaws of Alumni Agencies Board, Inc., is quoted in the Amended Complaint:

> The CEO shall be the chief executive officer of the Corporation on
> a full-time basis and will be responsible for its supervision and
> operation ***under the direction and control of the Chairman and
> the Board of Directors*** in accordance with the Articles of

Incorporation and these Bylaws. In addition, **the CEO shall (a) ensure proper communication with the Office of VMI's Superintendent to achieve, support, and follow VMI's approved strategic plan** and coordinate for support of the Corporation's and the VMI Alumni Agencies' functions, meetings, and other scheduled activities impacting VMI resources as well as the personal involvement of VMI's Superintendent in support of these functions, meetings, and activities and **(b) manage the business affairs, functions, and operations of the V.M.I. Alumni Agencies** *under the oversight of the Boards of Directors of each of the VMI Alumni Agencies* **and serve as the chief liaison between each of the V.M.I. Alumni Agencies and VMI.** The CEO shall also serve as the Secretary of the Corporation. For purposes of these Bylaws, the term "VMI Alumni Agencies" shall have the same meaning as set forth in the Articles of Incorporation.

AC at ¶ 41. The Plaintiffs focus on the underlined language about the CEO communicating with VMI's superintendent to "follow" VMI's strategic plan, managing the affairs of each alumni agency, and serving as a liaison with VMI. *Id.* However, the language about to whom the CEO is directly accountable (italicized) is more critical for analyzing questions about *control*. The italicized language explains that the CEO acts "under the direction and control of the Chairman and the Board of Directors [of the VMI Alumni Agencies Board, Inc.] in accordance with the Articles of Incorporation and these Bylaws" and works "under the oversight of the Boards of Directors of each of the V.M.I. Alumni Agencies." *Id.* This plain language contradicts the assertion that the CEO (along with the VMI Alumni Agencies Board, Inc., VMI, and the VMI Superintendent) assumed top-down control over the VMIAA. AC at ¶ 41. To the contrary, the CEO operates, at least in part, under "the oversight" of the boards of each VMI alumni entity, including VMIAA. VMIAA makes a similar point in its briefing. Dkt. 16 at 14 (contending that the language about which entities the CEO is accountable to does not suggest that the CEO is subject to VMI's control). Moreover, the duties that the Plaintiffs take issue with seem entirely consistent with what one would ordinarily expect of a leader of a private entity dedicated to

23

supporting a public institution of higher education. Indeed, it would be strange for the chief executive of an alumni organization to expressly work in opposition to a college's strategic goals or to not be a point of contact for college leadership.

Overall, the governance structures of the relevant VMI alumni organizations, including the actual defendant in this case (VMIAA) and other non-party entities, are inconsistent with the Plaintiffs' contention that VMI is "pervasively entwined" with these groups. Indicia of control over the VMIAA board, like the ability to appoint and remove members of its board, are absent in the Articles of Incorporation. Additionally, the formal presence that VMI is provided in some of the entities is curtailed by the fact that several of these positions lack voting power. Even within the head "umbrella" organization, the VMI Alumni Agencies Board, AC at ¶ 41, VMI only directly controls two of the nine seats on its governing board (one of the two nonvoting positions, one of the seven voting positions). Thus, to the extent that the governing board of the VMI Alumni Agencies Board is responsible for harms alleged by the Plaintiffs, VMI, through its one voting member (out of seven voting members) could not have controlled its decisions. *See Watts-Means v. Prince George's Family Crisis Center*, 7 F.3d 40, 43 (4th Cir. 1993) ("[E]ven if the board was responsible for the termination decision itself, the County, through its voting board member, could not have controlled or coerced this decision because it had only one of twenty-one total votes on the board.")

### *2. VMIAA's fundraising does not suggest a "symbiotic relationship" akin to the Burton case*

Although the Plaintiffs repeatedly label the relationship of VMI and VMIAA as "symbiotic," their Amended Complaint and briefing do not specifically analyze the alleged facts in connection with the "symbiotic relationship" case law. This concept arose from a case

involving a state entity that profited from racially discriminatory conduct. *See Burton* 365 U.S. at 724 ("profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency"). However, the Plaintiffs do not allege that VMI is profiting from discrimination. And as the Fourth Circuit has noted, Burton "does *not* stand for the proposition that all public and private joint activity subjects the private actors to the requirements of the Fourteenth Amendment." *DeBauche*, 191 F.3d at 507. To be sure, the Plaintiffs allege that the VMIAA is a major source of financial support to VMI, but that is also not, by itself, indicative of a symbiotic relationship or state action. In a somewhat analogous case involving the George Mason University Foundation, the Supreme Court of Virginia held that the Foundation - a private nonstock corporation – was not a public body subject to Virginia's Freedom of Information Act. *Transparent GMU v. George Mason University*, 835 S.E.2d 544 (Va. 2019). In a relevant portion of the decision, the Court noted that the state legislature "has long maintained" a public policy that "[e]ach public institution of higher education … shall be encouraged in their attempts to increase their endowment funds and unrestricted gifts from private sources and reduce the hesitation of prospective donors to make contributions and unrestricted gifts." *Id*. at 552 (quoting Va. Code § 23.1-101(1)). Though the FOIA context is distinct from that of Section 1983 and the Virginia Supreme Court's decision is not binding precedent on this matter, it strikes this Court as unsurprising that VMI has encouraged donors to contribute to the school through designated entities, like VMI Alumni Agencies, because Virginia's public policy has encouraged it to seek private donations. Even if it is true that VMI only "recognizes" donations through certain entities, including the VMI Alumni Agencies, AC at ¶ 46, it is hard to see how this plausibly transforms a group like VMIAA into an entity acting

under color of state law. *DeBauche*, 191 F.3d at 507 (explaining that mere "approval of or acquiescence in the initiatives of a private party" is not sufficient to constitute state action).

### 3. Allegations of VMI's involvement in Plaintiff's alleged injuries by VMIAA are largely conclusory

In general, a governmental entity "must play a role in the *specific decision* that led to the deprivations complained of by an aggrieved person." *Philips*, 572 F.3d at 183 (italics added).

Thus, it is important to take stock of the "specific decisions" at issue in Counts 1 and 2. The Amended Complaint is vague on this point because both counts assert that "at all relevant times to the allegations in this Complaint" VMIAA and VMI were "pervasively entwined and engaged in a symbiotic relationship" such that the Plaintiffs' First and Fourteenth Amendment rights were violated. AC at ¶¶ 110, 112, 117, 119. The Court assumes that the references to "suspended members" in Count 2 primarily refers to their suspension from VMIAA, however, it is unclear exactly which of VMIAA's decisions are specifically challenged in Count 1.

Legal principles around statutes of limitations and the parties' briefing provides some clarity about the actual conduct at issue. Because Section 1983 does not contain a statute of limitations, "courts borrow the statute of limitations from the most analogous state-law cause of action." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014). "For § 1983 suits, that cause of action is a personal-injury suit." *Id*. Under Virginia law, personal injury suits have a two-year statute of limitations. Va. Code § 8.01-243.1. Accordingly, the relevant cutoff date for the accrual of claims giving rise to the Plaintiffs' Section 1983 claims is June 6, 2022 (two years before the filing of their original complaint). *See also* Dkt. 22 at 2, Dkt. 26 at 5.

The parties dispute whether claims related to the April 6, 2022 annual meeting accrued at the June 11, 2022 special meeting. Dkt. 22 at 10, Dkt. 26 at 18. The Plaintiffs contend that at the April meeting VMIAA leadership "agreed to call a special meeting to enable the members … the opportunity to vote" on removing the VMIAA directors. Dkt. 22 at 10. Thus, they argue that the Section 1983 claims did not "accrue" until the June meeting, when they were "denied their right to vote." *Id.* at 10-11. Even if the Plaintiffs are correct on this point, the Court would find that they did not allege sufficient state action related to how VMIAA conducted its April 9, 2022 annual meeting. AC at ¶ 76 (alleging deprivation of right to vote and free speech at this meeting). Other relevant conduct specifically involving the defendant entity, VMIAA arise from the June 11, 2022 special meeting, *id.* at ¶ 80 (Plaintiffs alleging deprivation of right to vote and freedom of speech) and the September 2023 suspensions of seven Plaintiffs from the VMIAA and the adoption of various VMIAA policies. *Id.* at ¶¶ 85, 90, 93 (Plaintiffs alleging violations of due process rights and violations of First Amendment rights). The meeting-related conduct is relevant to Count 1 while the suspensions are tied to Count 2.

In analyzing these alleged claims, the Court must look to allegations related to the state's purported role in the specific conduct complained of.

In describing the April 2022 annual meeting, the Plaintiffs allege in a conclusory manner that VMIAA was "at all relevant time pervasively entwined with VMI and engaged in a symbiotic relationship," *id.* at ¶ 76. However, the specific facts alleged about how the meeting was conducted – the actions that allegedly deprived members of their First Amendment rights – are only attributed to the VMIAA President Sam Stocks and the VMIAA counsel George Roberts. *See id.* at ¶ 76-79. None of the conduct that led to the alleged deprivations of the Plaintiffs' rights (the decision to rule a motion out of order and the assertion that a separate

27

special meeting was required to remove directors) is attributed to the actions or statements of VMI personnel.

Similarly, the Plaintiffs complaints about the June 11, 2022 VMIAA special meeting are entirely about the actions allegedly taken by the VMIAA President and VMIAA "Nominating Committee." *Id*. at ¶ 80. Although the Plaintiffs assert that VMIAA "at all relevant times was pervasively entwined with VMI and engaged in a symbiotic relationship," *id.,* there are no alleged facts about VMI personnel specifically taking actions that deprived the Plaintiffs of their rights at this meeting.

Finally, the Plaintiffs allegations about the "unlawful suspension" of certain VMIAA members are also only about acts that VMIAA leadership took. Though the Plaintiffs repeatedly refer to VMIAA "acting jointly and in concert with VMI," *see* AC at ¶¶ 83. 85, 93, the actions complained of were all conducted by *VMIAA and its board of directors*. There are no factual allegations about how VMI specifically coerced or compelled VMIAA to suspend the members. The only exception to this observation is that the Plaintiffs allege that the suspension of Plaintiff Robert C. Morris, Jr. was "clearly orchestrated by VMI" because the timing of the suspension closely followed an unfavorable court ruling against VMI. AC at ¶ 82. Even so, the Plaintiffs point to no other facts that plausibly allege that VMI was specifically involved in the VMIAA suspensions or that VMIAA otherwise acted under color of state law.  Without further factual enhancement, this is not enough to state a claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that a complaint does not suffice under Fed. R. Civ. P. 8 "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'")

***

The Plaintiffs invoke legally significant labels like "pervasive entwinement" and "symbiotic relationship" to suggest that VMIAA collaborated with VMI in depriving them of their constitutional rights. But when the non-conclusory facts in the Amended Complaint are taken as true, they fail to plausibly allege that VMIAA acted under color of state law. The Amended Complaint (and the relevant Articles of Incorporation and Bylaws) only show that VMI lacks control over VMIAA and that the acts complained of are specifically attributable to VMIAA. Thus, because the Plaintiffs failed to allege facts that would plausibly show that VMIAA acted under color of state law, both Section 1983 claims will be dismissed.

## B. Remaining state law claims

The Court declines to exercise its supplemental jurisdiction under 28 U.S.C. § 1367(a) to consider the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a distribute court may decline to exercise supplemental jurisdiction over a claim brought pursuant to 28 U.S.C. § 1367(a) if "the district court has dismissed all claims over which it has original jurisdiction.").

## CONCLUSION

For the reasons provided above, VMIAA's motion to dismiss the Amended Complaint, Dkt. 15, is **GRANTED** as to Counts 1 and 2. The Court declines to exercise its supplemental jurisdiction over the remaining state law claims (Counts 3 and 4) pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the Amended Complaint, Dkt. 4, will be dismissed in its entirety ***with prejudice***. The Court will enter a separate accompanying order.

Entered this ___31st___ day of March, 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE